THE SYCAMORE MARSH HARVESTER COMPANY, PLAIN-
TIFF IN ERROR, V. JOSEPH GRUNDRAD, DEFENDANT IN
ERROR.

1. **Trial:** VERDICT. Questions of fact, and upon conflicting testi-
mony, are to be decided by the trial jury, and a verdict will not
be set aside on the ground of a want of sufficient evidence to
support it unless the want is so great as to show that the verdict
is manifestly wrong.

2. **Vendor and Vendee:** RESCISSION. When, by the terms of a
contract of sale of an article of personal property, the property
is to be returned to the vendor, if not satisfactory to the vendee,
the refusal by the vendor to receive the property will relieve the
vendee from the necessity of returning it before he can rescind
the contract. Such refusal being a waiver of the vendor's right
to a return thereof.

3. **The evidence** examined and found sufficient to sustain the
verdict.

ERROR to the district court for Colfax county. Tried
below before POST, J.

*C. J. Phelps*, for plaintiff in error.

*E. F. Gray*, for defendant in error.

REESE, J.

This action was brought to recover the purchase price
of a Marsh harvester which the plaintiff alleges it sold
to the defendant in error on the 16th day of July, 1880,
for the agreed price of $260, and for which the defendant
in error agreed to execute and deliver to the plaintiff his
promissory notes, in amounts and payable as follows:
$86.67 on the first day of January, 1881; $86.67 on the
first day of January, 1882, and $86 66 on the first day of
January, 1883. That said harvester was delivered to the

defendant, who received it, but refused to execute the notes according to his contract.

The defendant in his answer pleads several defenses, which for convenience may be condensed into the allegations that he purchased the harvester referred to of the plaintiff, but that the purchase was a conditional one; that the plaintiff warranted the harvester to be a good harvester, and do good work, and that it was mutually agreed between them that the defendant should pay $15 freight on the harvester and take it to his farm and use it in his harvesting that year, and if the harvester worked well and proved to be a good machine, he would keep it and execute his notes for the purchase price. But if the harvester failed to do good work it was to be returned to the plaintiff and the contract should be at an end. That under this agreement he took possession of the harvester and gave it a thorough trial, and it could not be made to work. That he notified the agent of the plaintiff of that fact, and he went to the farm of the defendant and tried to make it do good work as it was agreed it should do, but that the plaintiff's agent failed to succeed. That the harvester was not a good machine and could not be made to do good work, and that the defendant offered to return it to the plaintiff, who refused to accept it, but that defendant has at all times been willing and ready to return the same but plaintiff has refused to permit the same to be done. These allegations being denied by the plaintiff, the cause was tried to a jury upon the issues thus formed, who returned a verdict for the defendant. Plaintiff brings the cause into this court by petition in error.

A large number of alleged errors are assigned in the petition in error, upon which it is claimed the decision of the district court in refusing a new trial should be reviewed. But as nearly all of them are based upon the rulings of the court in admitting and rejecting evidence, none of which seem to be relied on in the plaintiff's brief, we will dismiss

that class of objections by saying that we have examined each one and carefully read all the evidence and have found none which could be in the least prejudicial to the plaintiff, and in fact we have failed to find any which seem to have been erroneous.

The only points relied upon by the brief of the plaintiff are—1st. "That the warranty given by plaintiff was such and such only as was printed upon the circular given by Bohman (the agent) to defendant, and that Bohman had no right to, nor did he make any other warranty;" 2d. "That there was no compliance on the part of Grundrad with the requirements of the law to enable him to avoid paying for the machine;" and 3d. "That the errors alleged in the motion for a new trial are well taken."

Upon the first point we find a direct and sharp conflict in the testimony. It is claimed on the part of plaintiff that the harvester was sold upon a printed warranty which was delivered to the defendant, while on the part of the defense it is as strenuously claimed that no printed warranty was made or given to the defendant, but that the contract was entirely verbal. The printed warranty which Bohman, the plaintiff's agent, testifies he gave the defendant, and which he says he signed, was not introduced in evidence, nor does it appear that any effort was made to procure it. However, another one was introduced and received in evidence, which Bohman testified was similar to the one given. A part of the examination in chief of Bohman is as follows:

Q. Now you may go on and tell the court and jury all you know about that trade and the conversation and talk you and he had together that day, all about it from the first to the last.

A. I have forgot a good deal of the conversation, but on the day I first talked to him he called on me after I had come home from the country. He had been looking at a machine in my yard, and wanted to know my price. I

asked him $265 and freight, in all $275. He wanted to get it to use during harvest and not to settle for it till after harvest. I told him he could not buy on any terms except on the company's warranty. I had blank orders and warranties attached. I took one of the blank orders and tore off the warranty part and gave it to him and told him to go and get somebody to read it for him.

Q. You say you tore the warranty off?

A. Yes, the warranty was torn off from a blank order, of which I had a large number in my possession.

\*    \*    \*    \*    \*    \*    \*    \*    \*

Q. Now you may go on with your story about your conversation with the defendant when you sold him this machine in question.

A. I signed the warranty that was given to the defendant that was similar to this one. I had a conversation with the defendant about it and explained to him the warranty.

Q. Who was present, if anybody, at the time you was having this conversation with him about the warranty?

A. John Kovar was present at the time, and perhaps others. Frank Adofske was present with him when I and he first talked it over. The first note was made payable the first of January following. He first came to my place about four o'clock in the afternoon, then I tore off the warranty, as I have said, and he went away with it and stayed away probably over half an hour, and then came back and wanted to buy a machine on his own terms; that is, to use it during the season and then if he liked it to pay for it then. I told him that I had not much interest in it, and that I could not sell on any terms but on the warranty of the Sycamore Marsh Harvester Co. He took the warranty and went away again, and when he came back he had some one with him; I am not certain who it was, whether it was his wife or boy, and he said it was then getting late and he would not take the machine then, but that he would

come back the next morning and get the machine. He came back the next morning and got the machine.

Upon cross-examination this witness testified that he first gave the defendant the warranty and order on one piece of paper, and defendant refused to sign the order for the machine, when he tore off the warranty part and gave it to the defendant that he might get some one to explain it to him, but that the sale was not made until in the evening when defendant drove along with his wagon starting for home. The witness Kovar, referred to by Bohman, testified that he was not present when Bohman and defendant were talking about the price and terms of the harvester, but that he saw Bohman hand him a piece of paper which was the printed warranty referred to. Upon this point the testimony of the defendant, his wife, and John Pollok was given by the defense. The testimony of defendant was as follows:

Q. What time of the day did you first see Bohman about it?

A. About two o'clock in the afternoon.

Q. Where did you see Bohman about it?

A. About his office.

Q. Just state what was said between you and Bohman at that time, at his office. Just tell it all.

A. I spoke to him about buying a machine, and Bohman asked me $315 for the machine; I said that I could not give it, that I could buy one in David City for $275; and he said he could not give the machine for those figures, but he would let the machine go for $285, and I turned and walked off, and I attended to the balance of my business in town, and went home.

Q. In the first conversation at two or three o'clock, was there anything said between you and Bohman about your signing an order for the machine?

A. There was not.

Q. Was there anything said after that time about a warranty?

A.    There was not.

Q.    Did you see Bohman again that night before you went home?

A.    I did.    I saw him again when I was going home. He stepped out in the street.

Q.    When you were going home, how did you go; did you drive a team, or how?

A.    I drove my team.

Q.    Who was with you?

A.    My wife, and my neighbor Pollok.

Q.    Where was it that Bohman come to you?    In the street, or where was it?

A.    When I was going past his office, he stepped out and held up his hand—this way.

Q.    When Bohman came out, did you get out of the wagon or stay in the wagon and talk with him?

A.    I stayed in the wagon.

Q.    What then was said between you and Bohman about the machine?

A.    Bohman asked me about what I thought about the machine.    And I told him if he would let me take the machine through the whole harvest, and guarantee that it would do good work, that I would give him $275.

Q.    Did you say anything else about what was to be done at the end of the harvest?

A.    I said if the machine will do good work through harvest I will give you the notes after harvest.

Q.    If the machine did not do good work through the whole harvest, then what?

A.    Then he would have to take the machine back, that I would not have any use for it, and Bohman agreed to that.

Q.    At that time, did Bohman want you to take a printed or written warranty?    That is when you was in the wagon?

A.    I did not receive anything, and there was nothing

offered to me.   I was making a verbal agreement with him.

Q.   State if at any time that day if you took from Bohman a printed or written warranty for the machine?

A.   I did not.

The testimony of Mrs Grundrad upon this point was as follows:

Q.   Were you with your husband when he made the bargain about the machine in question? ·

A.   Yes.

Q.   What was you doing at that time when the bargain was made?

A.   I was sitting in the wagon.

Q.   What was your husband doing?

A.   He was sitting in the wagon, and Bohman came up and stopped us.

Q.   Was there anybody else in the wagon?

A.   Yes; Mr. Pollok.

Q.   What did your husband and Mr. Bohman say then?

A.   Bohman asked him whether he wasn't going to buy that machine from him.

Q.   What did your husband say?

A.   He said that if he would let him have the machine on those conditions (there were several things spoken about) that he was going to take it.

Q.   What conditions were spoken about?

A.   My husband made an agreement with him that if the machine did good work through the harvest, that he would take the machine, and if the machine did not do good work, he was going to take the machine back.

Q.   What did Bohman say to that?

A.   He said that he would guarantee that the machine would do good work and if not that he would take it back.

The testimony of John Pollok upon this point, after stating that he was in the wagon with the defendant and his wife at the time referred to, is as follows:

Q. What did Bohman say, and what did Grundrad say? Tell it all.

A. Grundrad told him he would take the machine if it would do good work through harvest, and he would give him the notes after harvest.

Q. If it did not do good work through the harvest, what then, what was said about that?

A. If it did'nt do good work he would take it back.

Q. What did Bohman say to that?

A. He consented to that.

From the foregoing testimony it must ·be apparent to any one that the question as to whether the contract of warranty was in writing or verbal was properly left to the jury to determine; and that their verdict which must have found that it was verbal was sustained by sufficient evidence, and cannot for that reason be questioned. Indeed, it seems to us that they could not well have found otherwise, for by the testimony of Bohman himself, it is quite clear that if he did deliver the warranty to defendant as he testifies, yet it was not in pursuance of or a part of the contract, for he does not claim that the agreement was then made. It was simply given to defendant as an inducement to him to purchase on Bohman's terms, with a request that it be submitted to others for explanation, etc. The question of the authority of Bohman to make such a contract is not particularly important here, for if he made it, the plaintiff—as between it and Grundrad—is bound by it, if made within the apparent authority of the agent, whatever it might have been.

The next proposition submitted by the plaintiff in error, that there was no compliance on the part of Grundrad with the requirements of the law to enable him to avoid paying for the machine, is answered fully by the evidence in the case. The testimony shows that he offered and desired to return the harvester to Bohman, at Schuyler, but that he was informed that it would not be received if brought, and

that since said offer and refusal, the harvester has stood unused on his premises, subject to the ownership of the plaintiff. It would be a needless trouble to return the machine after such a waiver by the party entitled to the return. The law does not require it. *Padden v. Marsh*, 34 Iowa, 522. 12 Wheaton, 192. 1 Parsons on Contracts (5 ed.), 593.

Another point is presented by the petition in error and motion for a new trial which is perhaps covered by the third assignment in the brief of plaintiff, and that is, that the verdict of the jury "is against the clear weight of evidence and is not sustained by the same." In the examination of this question it must not be forgotten that the jury are the judges of questions of fact, and that a verdict will not be set aside as against the weight of evidence unless clearly wrong. Such has been the uniform holding of this court. *Jones v. Edward*, 1 Neb., 170. *Brown v. Hurst*, 3 Neb., 356. *Palmer v. The People*, 4 Neb., 76. *Seymour v. Street*, 5 Neb., 89. *Blackburn v. Ostrander*, Id., 219. *Storms v. Eaton*, Id., 459. *Johnson v. Phifer*, 6 Neb., 401. *Cook v. Powell*, 7 Neb., 284. *Roberts v. Swearingen*, 8 Neb., 372. *A. & N. R. R. Co. v. Jones*, 9 Neb., 71. *Huff v. Nims*, 11 Neb., 363. *O'Leary v. Iskey*, 12 Neb., 138. *Prescott v. Jones*, 13 Neb., 534. *Converse v. Meyer*, 14 Neb., 190. The conclusion of the jury that the contract of warranty rested in parol, as claimed by the defendant, being sustained by sufficient proof, we are next to enquire whether or not there is sufficient proof of the breach of that warranty to sustain the finding of the jury. The proof shows that when the machine was set up by Bohman, at the house of defendant, ready for cutting grain, the horses of defendant, when hitched to it and starting for the field, became frightened and ran, breaking and injuring the harvester. As to who was to blame for this, if any one, the testimony is conflicting. The defendant was sitting in the driver's seat and started the team.

He claims that after he started, Bohman, without his knowledge, threw the machinery "in gear" and thus frightened his horses, which caused them to run and break the harvester. Bohman claims that the horses first started to run, and by the rapid movement and jolting of the harvester it was thrown in gear by its own action. While we conclude this is not a material inquiry, as the machine was afterwards fully repaired, yet we cannot refrain from noticing the conflict in the testimony as to how far the horses ran. On the part of plaintiff, Bohman testified they ran "about a quarter of a mile," he thinks, and Kovar says they ran "about the distance of half a mile, or something like that," and on the part of the defense the defendant testified that they ran "from 35 to 40 steps." We will not try to harmonize this testimony. The harvester was considerably injured by this accident, some of the parts being broken so that it was necessary to replace them with others. But they were replaced, the repairs were paid for by the defendant, and afterwards, when the harvester was put to use in the field by Bohman and others, it was said by him to be as good as before, and worked as well as if nothing had occurred. The machine having been fully repaired at the expense of the defendant, so that its parts upon trial worked as well as before the injury, and no other or further injury having been shown, we think the fact of the accident may properly be dismissed without further notice. As to the subsequent failure of the harvester to work, there is not so much conflict in the testimony. Many parts of the machinery failed, the material of which they were made was, in some instances, proven to be defective. The witnesses testified that it would not work, and could not be made to work. It is true, that after the binding attachment had entirely failed, another was substituted for it, but the testimony shows that before ordering the new part the agent was notified by the defendant not to get it as he would not keep

the harvester. There was some testimony introduced tending to show acts of ownership over the harvester by the plaintiff's agents after defendant had notified him of his readiness to return it, and that he would not keep it. These acts consisted of disposing of parts of the machinery to others who owned similar harvesters, and were in need of repairs. One witness testified to having purchased and removed a part of the harvester, and that he made the purchase of an agent of plaintiff at David City, while another witness testified to having received authority from Bohman to remove another part. Bohman denied giving such authority. This testimony was admitted over the objections of the plaintiff, but we think it was properly admitted.

The testimony was conflicting on almost every material point in the case. The whole case seems to have been fairly submitted to the jury. There is no suggestion that the verdict was obtained by improper means, nor that it was the result of passion or prejudice. The district court did not err in overruling the motion for a new trial, and its judgment is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.