UNION PACIFIC RAILROAD COMPANY V. HENRY FICKENSCHER.*

FILED OCTOBER 5, 1905. No. 12,297.

1. **A** verdict will not be set aside on the ground of want of sufficient evidence to support it, unless the want is so great as to show that the verdict is manifestly wrong. *Sycamore Marsh Harvester Co. v. Grundrad*, 16 Neb. 529.

2. **Evidence** examined, and *held* to support the verdict.

ERROR to the district court for Dawson county: HOMER M. SULLIVAN, JUDGE. *Affirmed.*

*John N. Baldwin* and *Edson Rich*, for plaintiff in error.

*Warrington & Stewart, H. M. Sinclair* and *Roscoe Pound*, contra.

LETTON, C.

This action was brought by Henry Fickenscher against the Union Pacific Railroad Company to recover damages sustained by him in a prairie fire which he alleges was set out through the negligence of the defendant. Upon the trial a judgment was rendered for the plaintiff, from which the defendant prosecutes error.

A detailed statement of the facts with reference to the fire, together with a map of the locality, is to be found in

---

* Rehearing allowed. See opinion, p. 507, *post.*

35

*Union P. R. Co. v. Fickenscher*, 72 Neb. 187. The plaintiff in this case is the brother of John Fickenscher, and, with his father, Ulrich Fickenscher, was in company with John at the time they were all three burned in the prairie fire. In the petition in error the defendant assigns 55 different grounds, but upon the argument and in the brief a comparatively small number of errors were considered. The assignment of error upon which the most stress has been laid is that the evidence does not support the verdict, and it is urged that the evidence in this case does not differ materially from that in the case of John Fickenscher against the railroad company for injuries resulting from the same fire, and that, since that case was reversed upon the ground that the verdict was not supported by sufficient evidence, this case, likewise, should be reversed for the same reason. If no additional evidence has been produced by the plaintiff in this case to sustain his contention that the fire which burned him was the fire which started from the defendant's right of way, then, under the rule in the former case, he cannot recover. The point upon which the testimony in the case of John Fickenscher seemed to this court to be insufficient was as to the identity of the fire which burned him with that which started at the railroad.

The theory of the plaintiff is that, when the railroad fire struck the sand hills, it spread off over them and drifted northwest before the wind; that one branch of the fire went a little west of north and kept to the east of the road running between Fosburg's and Ditto's, and that another branch of the fire crept to the westward, south of Ditto's, and ran several miles north before the change of wind occurred, when it was blown back across the unburned grass between the two fires to the place where the injury occurred.

The defendant's theory is that the fire never got any farther west than the point where the plaintiff and his neighbors were fighting it on the line east of Ditto's, and that the fire which burned the plaintiff was an entirely

different one, which had been burning for some time many miles northwest of the place where the plaintiff was injured, and which was blown down from the northwest with great rapidity when the wind changed early on Monday morning.

The surface of the country lying to the north and northwest from where the fire started is made up of sand hills from 10 to 100 feet in height. These sand hills were at this time sparsely covered with dry grass, in the depressions between the hills the growth being heavier. From the physical configuration of the country it was difficult to see where any fire was exactly situated, except when it burned upon the hills or when the observer stood upon one of the numerous knolls or sand hills. South of these hills lies the Platte valley, which consists of level bottom lands, where there is nothing to obstruct the sight and over which it was possible for observers south of the sand hills at some distance to see the relative location of the fire east or west of a given line. In the other case the plaintiff relied upon the testimony of witnesses residing south of Brady Island, who say they saw the fire gradually spread west until late in the evening, when it appeared to be north of George's pasture, which adjoins Brady Island on the east.

At the trial it was admitted, by agreement of the parties, that that portion of the fire which came up from west of Vroman and extended north from Ditto's house to the house of Fosburg, east of the road as shown upon the map, was out by 11 o'clock of Sunday evening, April 16, 1899, and the plaintiff makes no claim by reason of that portion of the branch of the fire just described east of the road running from Ditto's to Fosburg's. This disposes of one line of fire as far south as Ditto's house, the fire that the plaintiff and his associates had been fighting, and leaves the fire that burned him to be accounted for either as being the fire that had been burning on Sunday afternoon far to the northwest, or as a branch of the railroad fire which had crept to the westward, south of Ditto's,

thence run northward at least 4 or 5 miles, and was driven back when the wind changed.

There were over 60 witnesses examined in the case, who had observed these fires from nearly every point of the compass. Part of the strongest evidence in behalf of the plaintiff came from the mouths of defendant's witnesses, the plaintiff having made the effort to introduce this testimony taken by the defendant at the opening of his case, but, upon the objection of the defendant that he expected to produce it, the defendant's objection was sustained, and it only came into the case by being offered by the defendant. One McIntyre, a witness for the defendant, testified that from about 12 o'clock until 2 o'clock on Sunday night he was fighting a fire near the west line of section 8 about one-half mile west of Ditto's house; that this was a side fire, and that the head fire had run 6 or 8 miles to the north, as well as he could judge. It was agreed, however, by the parties that if he were present upon the stand he would testify that, when he spoke of the head fire having gone on, he meant the fire that had gone east of Fosburg's. On cross-examination he testified that at 2 o'clock on Monday morning, when he left this place, a fire was burning to the northwest, which he supposed was the head fire of that which he was fighting. McIntyre is an employee of the defendant, who lives at Brady Island. Unless he was mistaken as to the locality, his evidence shows that a fire was burning about one-half mile south and west of Ditto's at that time, and one was burning 6 or 8 miles northwest, after the line of fire the plaintiff had been fighting was extinguished as far south as Ditto's. Two witnesses, Larson and Jacobson, testify that on Sunday afternoon and evening they had been fighting fire to the south and east of where McIntyre was; that the fire which they were fighting had burned along on the north side of sections 16 and 17, which would be in the direction of the point where McIntyre says he was, and that about 12 or 1 o'clock at night they saw a big fire up near them, apparently north and west of near

Ditto's. Jacobson further testifies that, when they were back-firing on Larson's pasture, they followed the south line of the fire to the west edge of the pasture, which would be about south of Ditto's house, according to the map, and the head fire had gone northwest when they got to the west line of the pasture. The testimony of one Scott, a witness for the defendant, who lives south of the Platte river, is to the effect that about 9 or 10 o'clock on Sunday night he saw a fire to the north of him; it seemed to be just above Mr. Beatty's place, which was just north of where Scott lived and a mile and a half west of Ditto's. This testimony is corroborated by the testimony of Pearl Scott, his daughter, who testified that she could see the flames of this fire and that it seemed to be north and west of Beatty's. John Elander, who lives a mile east of the place of injury, testified that at half past 2 o'clock on Monday morning he could see a fire—"a little flame or red"—3 or 4 miles northwest of his house. One Peterson, who lives northwest of Ditto's, says that he saw a fire by Ditto's house on Sunday afternoon, but did not see it after it got dark, although he looked for it; that at 10 o'clock at night he could not see any fire down there, that "it was west"; and testifies, further, in substance, that at that time he could see fire about 4 or 5 miles northwest. It blazed so high he could see the fire. He saw a fire much farther off to the northwest, but very faint, and the nearer fire that he saw in the northwest burned him out. That he watched it from that time until it came over his place about 4 or 5 in the morning. That at 8 o'clock on Sunday night he saw the "railroad fire" about 2 miles east of his place, but saw no fire toward Brady Island. He also saw a fire a little bit west, but mostly north. That the distant fire was away about 10 or 12 miles, he thought, and that, if he looked on a line north from his house, this fire that he saw at a great distance would be 6 miles west of that line, he thought. Mrs. Peterson also testified that on Sunday night about 9 or 10 or 11 o'clock she saw two fires in the northwest, one not as close as the other, and

did not see any fire southeast at that time; that she could see the flames of the northwest fire then, and that it was about 6 or 7 miles away. Mr. Pettit, who lives south of Peterson's and 2 miles northwest of Ditto's, says that between 12 and 1 o'clock on Sunday night the fire east of Ditto's had apparently gone out; that he did not see any smoke between his place and Brady Island, and that the fire which was in the northwest was apparently 25 or 30 miles away. Mrs. Anderson, who lived at his house, had been to Brady Island on Sunday night, and drove from there to Pettit's about 8 o'clock. There was no fire between Pettit's and Brady Island at that time. About 12 or 1 o'clock at night she saw a fire to the southeast or south.

A number of defendant's witnesses live 10 or 12 miles north and west of Brady Island, several living north of the station of Maxwell. Some of these men testify they saw a fire on Sunday evening toward Maxwell, close to Maxwell, while others saw no fire that afternoon. One Talbot, who lives on section 13, township 15, range 29, said on Sunday evening he saw a fire right east of him, which was going north; that the end toward the south seemed to be out, and the north end toward Cox's settlement seemed to be burning, and that the Cox settlement was 12 miles north and east, pretty nearly east. Another of defendant's witnesses, named Herring, who lives 14 miles northwest of Brady Island, saw a fire southeast of him on Sunday evening. That he and his son sat up and watched this fire until after midnight on Sunday night. W. T. De Witt, who lives about 7 or 8 miles north of Brady Island, saw a fire a little southeast of him, a very little southeast, on Sunday night, and, the last time he saw it, it seemed to be moving northwest. Mrs. Mott, who lives 5 miles north of Brady Island, testifies she first saw the southeast fire about 3 o'clock on Sunday; that she last saw it about 12 o'clock that night, and it appeared to be going northeast at that time; that she did not notice any fire to the northwest at that time, but that early in the morning she saw a fire to

the northwest, some distance away, and that it came to their place in about 2 hours from the time she first saw it. Theodore Anderson, a boy, who lived $2\frac{1}{2}$ miles northeast of Brady Island, says that at midnight that night he was on the southeast corner of their place, and that he could see a fire south of the place when he was there; that the fire appeared to be between a mile and a quarter and a mile and a half away.

In addition to this testimony a number of witnesses for the plaintiff, who live in the Platte valley, some of whom did not testify in the former case, testified to the location of the fire during Sunday evening and night among the sand hills on the north side of the railroad. These witnesses place the location of the fire to the west of the line of fire extending from Fosburg's east to Ditto's and thus corroborate the testimony of McIntyre, Larson, Jacobson and other witnesses, who described a line of fire as being west of Ditto's. So far, then, as the existence of a line of fire to the westward of the line contended for by the defendant as the west line of the railroad fire, we are of the opinion that there was sufficient testimony to submit to the jury, if sufficiently connected with the fire at the place of injury to make it probable that this fire was the proximate cause of the injury.

We must next consider whether there is any evidence to connect these fires. The Fickenschers, with Fosburg and others, in the party who were fighting the fire to the east of Ditto's, were at Ditto's on their way home at about 1 o'clock in the morning. Mr. Ulrich Fickenscher, the father, with his sons, John and Henry, left Fosburg's while it was still dark, and apparently reached the place of injury about half past 4. This fire reached Ditto's before daylight, for he testifies that his wife was wakened and she woke him up sometime before daylight. A number of defendant's witnesses, who lived far to the north and northwest of the place of injury, testified that the fire which came from the northwest reached them by daylight. The fire reached Peterson's, 2 miles west and $1\frac{1}{2}$ miles south of

the place of injury, about 5 o'clock on Monday morning. Mr. Pettit, who lived south of Peterson, testified that the fire struck him between 5 and 6 o'clock on Monday morning. Mr. Guyer, who lives 10 miles north and 10 miles west of the place of injury, says that the northwest fire came down on him on Monday morning at daylight. Edward Johnson, who lives about 5 miles north and 1 mile west from the place of injury, testifies the fire reached him from the northwest just a little before daylight. One Wilson, who lives north and west of Maxwell, far to the northwest of Brady Island, testifies that the fire from the northwest came to his place just before daylight. One Herring, who lives 14 miles northwest of Brady Island, says the fire from the northwest reached his place about 4 o'clock on Monday morning. Mr. De Witt, who lived still north of Herring, testifies that he had been up watching both fires; that the south fire was running northwest, as nearly as he could make out; that he was awakened in the morning by a rush of wind that struck the north window; that it was about 4 o'clock; that he went in and lay down again, when his wife told him to look out for the fire; that it was about 4 o'clock, just getting daylight at that time. Mrs. Mott says that she first saw the northwest fire toward morning, somewhere near the break of day, and that it took about 2 hours to come to their place; that she first saw it in the northwest, and that it was just daylight when it passed their place, which is north of Brady Island, and about 6 miles northwest of the place of injury. Elander says that, when he came back from fighting the southeast fire about half past two in the morning, he could see a little bit of flame about 3 or 4 miles to the northwest and a little north, but mostly west.

It is said in the opinion by Mr. Commissioner DAY in *Union P. R. Co. v. Fickenscher, supra:* "It seems a striking fact that none of the neighbors living in the vicinity of where the fire is supposed to have burned saw it or even the reflection of it." But in this case we have the testimony of George and Pearl Scott, of Lynch and of Guyer,

and of other witnesses, which was not taken in the former case, and have additional facts from the same witnesses, such as the burning of the grass under the fresh-turned sod, and the finding of burned-over ground in the line over which the Fosburg-Fickenscher party was back-firing.

In this examination of the testimony we have selected only that part of the same which tends to support the plaintiff's contention. If the evidence upon the part of the plaintiff, standing alone, is sufficient to convince any ordinary and reasonable mind that the fire which burned the plaintiff found its origin in a fire which started by defendant's negligence upon its right of way, then there is sufficient testimony to support the verdict. A verdict will not be set aside on the ground of a want of sufficient evidence to support it, unless the want is so great as to show that the verdict is manifestly wrong. *McCune v. Thomas,* 6 Neb. 488; *Sycamore Marsh Harvester Co. v. Grundrad,* 16 Neb. 529; *Young v. Roberts,* 17 Neb. 426; *Spurck v. Dean,* 49 Neb. 66.

We think there was sufficient circumstantial evidence that a branch of the railroad fire was burning west and northwest of Ditto's after 11 o'clock on Sunday night, that it had run to the north and west, just west of Ditto's, and that the change of wind on Sunday morning blew it to the southeastward, and to the point where the plaintiff was injured before the fire which had been burning far to the northwest came down, to warrant the court in submitting the whole question to the jury. The stories told by the witnesses upon both sides are in many instances contradictory and inconsistent with that of other witnesses upon the same side of the case. The writer's experience of over 35 years in this state has taught him that the smoke arising from, and the reflection in the sky of, a prairie fire are often very poor guides to its actual situation, and the testimony in this case has only served to confirm this experience. We do not believe that the witnesses wilfully misrepresented the facts, but some of them must have been mistaken as to the fire. The jury were men who lived in the

sand-hill country, who knew the conditions surrounding them, and whose experience in their daily walk of life was a valuable factor in weighing the testimony and in arriving at a proper verdict. From the circumstances, direct evidence of the identity of this fire with the railroad fire was unattainable, and the plaintiff was obliged to rely upon circumstantial evidence. While not entirely satisfied, we do not feel justified in displacing the tribunal provided by the law to determine questions of fact, and believe that the verdict is not contrary to, but is sustained by, the evidence.

Error is assigned in permitting cross-examination of the witness Kreitsenstein as to facts occurring after the time to which his examination in chief was directed. We are unable to see wherein the defendant was prejudiced by this cross-examination.

It is urged that the court erred in sustaining an objection to a question asked the engineer of the train that set out the fire. The question was answered before the objection was made. The answer was not stricken out, so the defendant suffered no injury by the ruling. Besides, the engineer afterwards testified, without objection, substantially to the same effect.

The objections urged to the giving and refusal of instructions we think are not well taken, and the case appears to have been fairly submitted to the jury .

Error is assigned by the defendant with reference to an admonition given to the jury by the court, after it had been out about 24 hours, as to the importance of their agreeing upon a verdict. We fail to discern in what manner the defendant was prejudiced by this remark. It appears that jury did not agree upon a verdict for 3½ hours after this advice was given by the court, which shows that, if the admonition had any effect, it took a long time to operate, and that the jury took full time for deliberation thereafter.

We do not believe that the other matters complained of, which were presented to the trial court at the time the

motion for a new trial was heard, are of sufficient gravity to warrant this court in reversing the judgment of the trial court in refusing to grant a new trial.

Upon the whole, the case seems to have been carefully and impartially tried and submitted to the jury, and we recommend that the judgment of the district court be affirmed.

OLDHAM, C., concurs. AMES, C., not sitting.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

The following opinion on rehearing was filed December 7, 1906. *Reversed:*

1. Verdict: EVIDENCE: REVIEW. This court will not set aside the verdict of a jury for want of evidence to support it, if there is sufficient evidence in the record, taken by itself, to have supported a judgment by default, unless the preponderance of the evidence against the verdict is so strong as to indicate that the verdict must have been predicated upon something other than the evidence.

2. Railroads: ACTION FOR DAMAGES: EVIDENCE. In an action for damages by fire originating in the carelessness of the defendant, the plaintiff to establish his cause of action must trace the fire from the place of its origin, and identify the fire which caused the damage with the fire which was originated by the defendant. If the evidence shows several prairie fires of different origin, each of them originating several miles from the place of damage, it is not sufficient to show that it is more probable that the fire started by the defendant was the one that caused the damage. A verdict cannot be supported by probabilities and conjecture.

SEDGWICK, C. J.

This is an action for damage by fire which it was alleged was caused by the negligence of the defendant. A map showing the location, and in part also the course of the fire, may be found in connection with the opinion of

this court in the case of *Union P. R. Co. v. Fickenscher*, 72 Neb. 187. Ulrich Fickenscher and his two sons, John and Henry, were together when they were injured by fire on the night in question, and each of them brought an action against this defendant to recover damages. The case just referred to was the action of John Fickenscher, and in that case it was held that the evidence was not sufficient to support the verdict against the defendant. In the case of Henry Fickenscher it was held that there was sufficient evidence to require the matter to be submitted to a jury, and that a judgment for the plaintiff based upon a favorable verdict of a jury should be affirmed. *Union P. R. Co. v. Fickenscher, ante,* p. 497. It was thought that further evidence had been given in the latter case sufficient to require a different conclusion from that reached in the former. A motion for rehearing was filed in the case of Henry Fickenscher, and, as the action of Ulrich Fickenscher and two actions against the same defendant begun by John Westlund and John Fosberg, respectively, were all actions for damages alleged to have been occasioned by the same fire, all of the plaintiffs being represented by the same counsel, arguments were heard in all the cases together. It was substantially conceded upon the argument by counsel for the claimants that this court was in error in supposing that there was other and different substantial evidence in the Henry Fickenscher case, distinguishing it from the John Fickenscher case before determined by this court. It was insisted that the decision of this court in the first case was not now binding upon the court in the other cases. It was urged that that judgment could not be considered as *res adjudicata* in the other cases, because the parties were not the same, and, also, because all of the cases depended upon questions of fact, and upon the issue in each case the trial was had and witnesses examined independently of the trial of the issues in the case first decided. It was also conceded that the evidence upon the principal issue in the remaining cases was substantially the same as the evidence

in the Henry Fickenscher case. It was urged that the court re-examine the whole question upon the record in the Henry Fickenscher case, and upon that theory the argument upon the last hearing was presented. Believing that counsel are correct upon these preliminary questions, we have re-examined the question presented in the light of the additional briefs filed and the subsequent arguments.

From the foregoing observations it will be seen that it is now unnecessary to restate the general outlines of the evidence as contained in the record. Such statement will be found in the two opinions above referred to, and reference is made to those opinions and to the map accompanying the first. It will be remembered that the plaintiff, Henry Fickenscher, with his brother John and his father and Mr. Fosberg were fighting the main branch of the "Vroman fire" (the fire which originated upon or near the right of way of defendant) near Mr. Fosberg's place, with a number of other people, until that fire was extinguished, and the plaintiff, with his brother and father and Mr. Fosberg, went down to Mr. Ditto's place to fight the fire which was burning just south of this place. They reached Mr. Ditto's place at about 1 o'clock, and continued in that vicinity until about 3 o'clock in the morning, when they started to return to Mr. Fosberg's place. The distance was three or more miles. These four men seem to be intelligent men and fair witnesses. They were in a wagon drawn by Mr. Fosberg's team. The plaintiff himself was a lad of about 18 years. He was exhausted with his labor and was sleeping in the wagon. Mr. Fosberg was driving the team. He testifies that the wind began to come from the northwest at about the time they started to go home, that it grew stronger as they went on, and that before they reached his place it was blowing in a gale. He drove his horses as fast as he could make them go; they were running. He was asked if he noticed fire in the north and northwest before he got home, and answered: "I noticed in the sky there must be some fire, but I couldn't see any on the ground." When they came to within about 40 rods of Fos-

berg's house, where the Fickenschers had left their wagon, the Fickenschers took their team (which they had been leading behind the Fosberg wagon) and wagon and started for their home about three miles directly north. They had gone about 80 or 100 rods when the fire from the northwest was upon them and the plaintiff suffered the injury sued for.

In the briefs and in the oral arguments some attention was given to the evidence tending to show that the fire, which was of unknown origin and which came down from the northwest, was the cause of the damage complained of. The defendant insisted that this was the fire that damaged the plaintiff. Of course, if that contention could be established, it would relieve the defendant of liability. If, however, the defendant failed to establish that contention, the burden would still rest upon the plaintiff to show that the fire which originated by the defendant's negligence was the cause of the damage. To prove that the defendant originated a fire, and that the plaintiff was damaged by fire, and that the fire originated by the defendant could have caused the damage, would not be sufficient to make the plaintiff's case. This, as was shown in the first opinion, would be basing a verdict upon possibilities and conjecture. In order to make the defendant responsible for the damages caused by the fire, the plaintiff must prove that the fire originated by the defendant was the fire that caused the damage. The course of the fire must be traced by the evidence so as to connect the fire that caused the damage with the fire for which the defendant is responsible. If the plaintiff has failed to do this, then the evidence in regard to the fire called the "northwest fire" cannot establish a cause of action in this case. It is not a question of probabilities as to which fire caused the damage. The jury were not at liberty to take a general view of the whole evidence and see which was more probable, and base their verdict upon the weakness of the evidence tending to show that the northwest fire caused the damage. It is not clearly shown by the evidence how far

the northwest fire (the fire of unknown origin) was distant from the scene of damage at the time that the wind changed from a southerly direction to a northwesterly direction. After the change the wind came down from the northwest in a vigorous gale. Some witnesses estimated it as high as 50 miles an hour, and if we suppose that the rate of the wind was 40 miles an hour, and that the fire traveled at one-half that rate after the wind from the northwest had reached it, and if the fire was then 20 miles distant from the scene of damage, the gale would reach that place in 30 minutes, while it would require an hour for the fire to travel over the same distance; so that the fire would not reach the place where the damage occurred until some 30 minutes after the gale reached it. The evidence shows that the fire traveled very rapidly. Some of the witnesses testified that its rate was faster than a horse could run, but the evidence is not harmonious and certain on any of these points, and there was some latitude left for the finding of a jury. The gale may have reached the place of damage an hour in advance of the fire or, possibly, even more, and we do not think that the evidence is so conclusive upon this point that the verdict of the jury, which essentially finds that this fire from the northwest did not cause the damage, is unsupported by sufficient evidence upon that point. The evidence in regard to this fire, then, is not conclusive on the question under investigation. We are not at liberty to say what our conclusion would be upon the evidence as to whether this northwest fire caused the damage. It is sufficient to say that the evidence taken together upon that point is all of so conflicting a nature that the question must necessarily have been left to the determination of a jury.

The remaining question, then, and the question upon which the determination of these cases depends, which has already been referred to, is whether there is sufficient evidence in this record to support a finding that the fire, originated by the carelessness of the defendant, caused the damage. This itself is peculiarly a question for the jury.

If there is substantial and credible evidence tracing the fire from its origin near the defendant's right of way and connecting it with the fire that caused the damage, this court will not interfere with the finding of the jury, even though it seems clear that the preponderance of the evidence is the other way. In other words, the court will in no case set aside the verdict of the jury upon questions of fact, if there is sufficient evidence in the record, taken by itself, to have supported a judgment by default, unless the preponderance of the evidence against the verdict is so overwhelming as to indicate that the verdict must have been predicated upon something other than the evidence. It has been said that, as a chain is no stronger than its weakest link, so if the chain of evidence entirely fails at some vital point, there is a failure of proof; and if the testimony of the witnesses, taken together, does not show that this fire for which the defendant is responsible extended to the place where the damage occurred, and there are no circumstances proved from which such conclusion is a reasonable inference, the plaintiff's case must fail. The fire caused by the defendant originated a little over 7 miles south, and a short distance east, of the place where the damage sued for occurred. The course of this fire, as shown upon the map referred to, was for about one-half of its distance a little west of north, and then nearly directly north until it had reached a place about 80 or 100 rods southeast from the place of damage, and then in an irregular course to the north and east, where it was extinguished. The map is substantially, although not entirely, accurate in showing the course of the fire as disclosed by the evidence. It is sufficiently accurate for the purposes of this discussion. The witnesses agree, and it is conceded by the parties, that this fire, which is called the "head fire," was extinguished before the injury complained of occurred.

The contention is that a branch from this fire ran to the west, and then north, until it was caught by the gale from the northwest and brought down to the place of damage.

Upon this contention the plaintiff rests his case. There is evidence showing that a side fire left this fire at a point about $4\frac{1}{2}$ miles south of the place where the accident occurred and burned toward the west. This was south of and not far from, the line between sections 9 and 16; and the plaintiff insists that there is evidence sufficient to warrant a finding that this fire ran to a point nearly north from Brady Island, and thence in a northerly direction until it encountered the gale from the northwest and was carried to the southeast to the place of the accident. In opening the discussion upon this point the plaintiff's brief says: "Of the testimony to sustain the verdict, the witnesses may be properly divided into four groups: (1) Those who actually saw the fire go west and northwest of the Fosberg-Ditto road. (2) Those who lived on the Platte valley and could see the fire north of them, and did observe its location east or west of a given line. (3) Those who saw fire in the locality west of where the boy was burned, shortly before the wind changed. (4) Those who testify concerning the time when the northwest fire came down." The witnesses Charles Jacobson, Anna Johnson, Thomas Lynch, J. R. Elliott and William McIntyre are named by the plaintiff as the ones who actually saw the fire go west. The brief says that McIntyre's testimony is very important. It is natural therefore first to look at his evidence. This witness resided in Brady Island, four miles west and half a mile north of the place where this side fire is alleged to have left the main line of the fire. He testified that he went out where the fire was burning, and arrived there at about 12 o'clock Sunday night. He remained there about one hour and a half or two hours, and was plowing and fighting fire. He says that two men were with him. He does not know who they were. The first one was a "bum," and the other he thinks was Robert Craig, but he is not sure. He says that the fire that he was fighting was "south of west about half a mile" from G. L. Ditto's place. The witness did not go to Ditto's place, and he does not disclose any means of

knowing in what direction he was from Ditto's place, except that he knew the general location of Ditto's place and estimated about how far he had gone from Brady Island, so that his evidence in regard to the exact location is somewhat indefinite. If his evidence is believed, it would not tend to prove that the fire had progressed more than one mile to the west from the main fire. He says that the fire was traveling a very little west of north, and, when asked at what rate it was traveling, he said that he did not know, "but it was a fire that was kind of backing, there was very little wind at that time." He was then asked the leading question: "The direction in which the fire was traveling under the prevailing wind would have driven this fire past James Romine, who lived on northeast quarter of 16-12-26, and past Pettit, who lived on southeast quarter 32-13-26, would it not?" His answer was: "Why, if you gave it time, I suppose it would have backed in." This it will be remembered was the last that this witness knew of the fire. He left it at about 2 o'clock in the morning. He plowed a furrow from one-half to three-quarters of a mile long while he was there. This furrow was very nearly east of the west line of section 8. The purpose would seem to have been to stop the westward progress of the fire beyond that point. He says that the wind changed direction about 3 o'clock, which would be an hour later. He says that he saw a fire to the northwest, and that this was "the head fire" of this same fire that he was fighting; but, as he himself was west of the main fire, he must have intended to have said northeast. The most that can be said of the evidence of this witness as supporting the plaintiff's theory is that the side fire, called in the record the "McIntyre fire," which was 4½ miles south of the place of the accident, had extended a mile toward the west, possibly a mile and a half from the main fire, about an hour before the gale from the northwest reached Brady Island.

The witness Jacobson lived about a mile south and nearly the same distance west from the point where the

side fire in question diverged from the main fire.  He says
that he saw the main fire, and that it moved nearly north,
a little west, and that, at about 10 o'clock or after, the
fire went up into section 16.  The course of the main fire
seems to have been across the corner of section 16 and his
evidence would indicate that this was what he had in
mind.  About 10 o'clock this witness went over to the
scene of the fire.  He was asked to point out on the map
about where he found the fire.  He seems to have hesitated
and was asked if he could see, and said that he could not
see very well.  He seems to have pointed out a place on
the map where he understood the fire was at about 10
o'clock, but the record does not show where he so located
it, but he says he fought a back fire on the east line of his
fence, which will be shown by a glance at the map could
not have been this side fire in question.  He says that the
fire·that he was fighting ran "northeast across the north
end of the pasture."  The pasture included nearly all of
section·16, and the main fire, as before stated, ran across
a corner of this section, so that it is not clear whether
the witness referred to the main fire or to the side fire
referred to by the witness McIntyre.  He said that he saw
a fire go off to the·northeast, and was asked the question:
"Tell the jury about how far that fire went off; in other
words, did it go in south of Ditto's"?  He answered: "Yes,
come that way, I can't tell exactly how far it went."  He
says that he found a sod that was turned over in his pas-
ture and was burned on the other side, showing that the
ground was burned before the sod was turned over; but
he fails to state where this was, or when or by whom the
sod was turned over.  The pasture included about three
sections of land.

The witness Elliott saw the fire only from the hotel in
Brady Island.  His evidence shows that he saw the re-
flection of the principal fire up to about 10 o'clock at night,
when he retired for the night.  Afterwards he again arose
and saw the reflection of a fire somewhere northeast of
Brady Island.  He does not know anything about what

time it was when he saw it, nor where the fire was located. This evidence is of no assistance in the case.

The witness Anna Johnson testified that she lived several miles south of Brady Island. She went to Brady Island to church between 6 and 7 o'clock. She then saw a fire down around George's pasture. This is the same pasture that is marked "Beatty's pasture" on the map. It lies directly east from Brady Island. She undoubtedly saw the reflection of the main fire, which all the witnesses agree was east from Brady Island at that time, and her mistake, if any, was in estimating the distance that the fire was from her. She left the church about half past 8 in the evening, and she says that the fire "looked like it was north of Brady, northwest." That the McIntyre fire should be northwest of Brady Island at that time is not possible under the evidence of all the witnesses. If she saw a fire to the northwest of Brady Island then, it must have been a third fire, which is indicated by the witness Peterson. She seems to have reached home at about half past 2 in the morning. She says she saw the fire then, "which was still moving on," and, when asked where she would say the fire then was from Brady Island, answered: "I could not say, I am not acquainted there. Q. Did it look like at was farther away and farther west? A. Yes, sir."

The witness Thomas Lynch was in Brady Island on the evening of the fire. He was there from 3 or 4 o'clock in the afternoon until the next morning. He noticed the fire as he went to Brady Island in the afternoon. He was asked: "Did you notice a fire north and east of the town of Brady Island that night?" and answered, "Yes, sir." This was between 10 and 11 o'clock. He was asked this question: "Q. And, when you say north of Brady, you don't mean on a straight line north, but you mean the fire was over here east of Brady and north of a line that would run through Brady east and west? A. Yes, sir."

Mr. Lawrence Larson, who was the owner of the so-called Larson pasture in which Mr. Jacobson lived, was

with Mr. Jacobson during the evening fighting the fire, which was on the east side of his pasture, to prevent its spreading over the pasture. He testifies that the fire also burned across the north side of his pasture, which was about the center of section 16, and not on the north side of that section, as shown in the map. He found in the morning that the posts of his fence along that line had been burned, but he did not trace this fire any farther to the west than other witnesses have done, that is, possibly, to section 17, but, at all events, not far into that section. His testimony, which is cited by the plaintiff as tending to show that the McIntyre fire escaped to the northwest in the early part of the evening, was in answer to this question: "Q. Now, I wish you would indicate on the map about where you left the east line of section 21 at 3 o'clock in the morning?" His answer was: "Why, I left it at the southeast corner." * * * "Q. What would you say, Mr. Larson, as to it being west of Ditto's at that time? A. I wouldn't say how far west, because I wasn't west myself only over to Jacobson's; but I should judge the fire was right in there around him, north and east and west and all over." The main fire, being that part of the Vroman fire which was afterwards extinguished, burned to the north, not more than a quarter of a mile west of a line due north from the Ditto farm. This testimony of Mr. Larson in regard to the fire north of him was given with reference to the time he left Mr. Jacobson's house, about 12 o'clock at night. A straight line drawn directly from Mr. Jacobson's house across Mr. Ditto's place would strike the line of the Vroman fire, which was afterwards extinguished. The McIntyre fire, if it ran into section 17, would be directly south of Mr. Ditto's farm; so that Mr. Larson's testimony proved that at that time he saw either the main branch of the Vroman fire or the McIntyre fire, or, perhaps, the reflection of both, and he may well have supposed that the fire was right around Mr. Ditto's farm. This evidence does not tend to prove that the McIntyre fire went father to the northwest than into section 17.

Mr. George Scott lived about five miles south and two miles west from the point where the McIntyre fire is supposed to have left the main course of the Vroman fire. If the McIntyre fire extended a mile and a half west into section 17, it would be nearly due north, perhaps half a mile east of Mr. Scott's place. He says that between 9 and 10 o'clock he saw a fire "most due north" from his place, "and that would bring it up about Mr. Beatty's place." Mr. Beatty's place extends into section 17, so that this evidence does not tend to show that the fire was farther west than it was shown to be by the witnesses who were present at the McIntyre fire.

The evidence of the five witnesses relied on by plaintiff attempts to trace the side fire, which is called the McIntyre fire, and which left the main line of the Vroman fire, as above stated, and tends to prove that it extended west in the vicinity of the north line of the Larson pasture for a distance of about a mile. It does not tend to prove that it extended farther than a mile and a half. There is no evidence of any other witnesses who saw this fire advance, or afterwards traced its course farther to the west or north. There is testimony that several "sods" were observed that had been turned over by the plow, and were so burned on the under side as to indicate that the plowing was done after the fire had passed over. The evidence shows that some of the plowing, at least, was recklessly done (as by the witness Lynch and those with him), and those accompanying the men doing the plowing were continually "backfiring," so that evidence that a few isolated burned sods were turned by the plow is of no consequence.

What is the evidence to trace this "McIntyre fire" from the place where it is left by these witnesses to the place where the damage occurred? It will be remembered that the McIntyre fire is supposed to have left the main course of the Vroman fire at a point something over four miles directly south of the place where the damage occurred. The fire did not pass between section 32, where Mr. Pettit resided, and Brady Island. This is clearly shown by the

evidence, and is conceded by plaintiff, and will be again referred to.   To have escaped, then, to the northwest, as contended, this McIntyre fire must have passed between Mr. Pettit's place and the main line of the Vroman fire, which is a little over a mile, possibly a mile and a half, distant.   The plowing done by Fosberg and Fickenschers from soon after 12 o'clock until about 3 when they returned to Fosberg's place, is shown upon the map along the line of road from Fosberg's to Ditto's farm.   The McIntyre fire, upon plaintiff's theory, must have passed several miles along substantially the same general direction of this plowing, and not long before the plowing began.   It seems incredible that these men could have spent several hours in plowing along the vicinity where the fire had so recently passed; and, when it is remembered that there is no direct evidence that the fire had passed through there at that time, then, it must be said that there is an entire failure of evidence at that point, unless it is shown that there actually was fire to the north and west of the Pettit farm between 12 o'clock and the time of the commencement of the northwest gale, and this be regarded as evidence that the McIntyre fire must have gone through the route indicated.

In the plaintiff's brief the evidence that a fire passed toward the north on the east side of the Pettit farm is discussed in two branches, the evidence of those witnesses who resided on the Platte valley to the south of Brady Island, and the evidence of those witnesses who resided in the vicinity of the Pettit place.   The witnesses who resided on the Platte valley were not situated so as to give satisfactory evidence in regard to the location of a fire that must have been seven or more miles distant, and it is not necessary to enter into analysis of their testimony.   Mr. Peter Peterson and his wife, who also lived on section 32, both testified that at 10 o'clock in the evening they saw a fire three or four miles northwest of their place, and that it was a big fire.   If this evidence is true, it establishes the existence of a third fire.   It could not have been the fire

that came down from the northwest, because that fire clearly had not reached within three or four miles of the Peterson place at that hour of the night. It could not have been the so-called Vroman fire, because the course of the main branch or "head fire" is traced by the evidence, and it is conceded that that branch of the fire was extinguished before the damage occurred. It could not be that the so-called McIntyre fire, that is, the branch of the Vroman fire which extended to the west, and in regard to which so much evidence was received and so much discussion was had on the part of both parties, extended to the west and north between Mr. Pettit's place and Brady Island. Indeed, in the last brief filed in behalf of the plaintiff, it is said: "No one ever claimed that the McIntyre line of fire went between Pettit's place and Brady Island, or south or southwest of him, but that it did go east of him." Mr. Pettit's place joins the Peterson place on the south, and Mr. Anderson's place is in section 20, a mile directly north from Peterson's place. Mr. Anderson testifies that the fire burning north from Vroman's did not at any time burn south of Pettit's house. This evidence is so far corroborated and is so far reliable that it is quoted as reliable in plaintiff's brief. We have seen that there is an entire failure of proof that the so-called McIntyre fire passed over the territory between Pettit's place and the place of the accident, and then off to the west, so as to be northwest from Peterson's place at 10 o'clock in the evening. It follows that, if the evidence of the Petersons is regarded as credible, it goes far toward proving that a third fire had been started in the northwest before the so-called northwest fire came down with the gale. The evidence shows, and it is also a matter of common knowledge, that backfiring, as it is called, is a usual method of protecting one's property from approaching fire. When the wind had changed to the northwest, and had reached the fire that is called the northwest fire, and had increased the volume and power of that fire so as to make it visible to those in the course that that fire must take, the people threatened

would be justified in putting out new fires for their protection. Did the fire which is testified to by the Petersons have such an origin? These plaintiffs, in order to recover from the defendant, must so trace the fire originated by the defendant as to show that that fire, and no other, was the cause of their damage. Their evidence wholly fails to do this. They have been greatly injured without any fault of their own, and the party who caused their injury ought to make good their loss. Their misfortune is in not being able to produce evidence to prove who caused their damage.

The judgment heretofore entered is vacated, and the judgment of the district court reversed and the cause remanded.

REVERSED.

LETTON, J., concurring.

I have carefully reexamined the entire record in this case in the light of the aid afforded by the briefs and argument of counsel upon rehearing. As indicated in my former opinion, the question is a very close one. I think, however, that there is ample evidence to sustain the plaintiff's contention that a portion of the Vroman fire extended westward from the Ditto-Fosberg line, and that this branch fire, extending across the north line of the Larson pasture and northward into section 8, is the identical fire which is testified to by the defendant's witness, McIntyre. At 2 o'clock in the morning McIntyre ceased fighting the side line of a fire, the head of which had passed northward in the direction the wind was blowing. John Elander, whose place was a mile east of the place of injury, testifies that at half past 2 o'clock in the morning he stood on a hill and could see a little bit of flame or red about three or four miles away. It was "a little north, but mostly straight west of me." This would place the fire about two or three miles west and north of the place of injury, and about four miles north and a little west of where McIntyre was, and in the direction in which he said the fire had gone. No wit-

nesses testified, however, to seeing this fire between these two points. Several witnesses at a distance, who saw reflections in the sky, gave their opinions as to where the fire was, but could not definitely settle its locality. My associates are of the opinion that for the lack of direct evidence upon this point a case has not been made for submission to the jury. I think the testimony justifies the conclusion that the McIntyre fire extended northward; but the doubt is whether there is sufficient evidence that it went as far north as the point where Elander saw the flame, to justify the submission of the question to the jury. As to this point there is grave doubt. Much of the testimony in the case has but little relevancy to the inquiry as to whether the fire passed northward between Pettit's and Ditto's, and on a new trial further facts may be developed upon this question. As is pointed out by the chief justice, the parties seem to have spent much more energy in asserting and denying that the northwest fire caused the injury than upon the principal inquiry whether the Vroman fire ever reached the point where the plaintiff was injured.

I do not concur in several of the deductions drawn in the opinion, but, under all the circumstances, concur in the conclusion reached.